**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

PRISCILA ALVAREZ, EUNICE DE LA PENA, and CHARLENE YATES, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

DUNKIN' BRANDS, INC. and INSPIRE BRANDS, INC.,

Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Priscila Alvarez, Eunice De La Pena, and Charlene Yates ("Plaintiffs"), by and through undersigned counsel, bring this action on behalf of themselves and all others similarly situated against Dunkin' Brands, Inc. ("Dunkin") and Inspire Brands, Inc. ("Inspire") (collectively "Defendants"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action on behalf of themselves and all similarly situated consumers who purchased allulose-sweetened Dunkin' Zero beverages, which Defendants market and sell as containing "0g of sugar" and "zero sugar" (the "Products").[1]

[1] The Products are comprised of every beverage sold under the Dunkin' Zero name, including the Blackberry Tangerine, Tropical Mango, Juicy Peach, Glamberry (Blackberry Tangerine + Juicy Peach), Sunzest (Tropical Mango + Juicy Peach), and Blushpop (Blackberry Tangerine + Tropical Mango) varieties introduced on March 2026, and the Watermelon Lime, Splashberry,

2. However, unbeknownst to reasonable consumers, the Products contain sugar in the form of allulose. Allulose is a monosaccharide and therefore a sugar under the applicable federal and California labeling standards. It is not present in trace amounts: Defendant's labels quantify between 5 and 10 grams of allulose per labeled serving.

15. Defendants' Products contain between 8 to 10 grams of allulose for mediums, and 11 to 13 grams of allulose for larges—far more than the 0.5-gram cutoff and far above the less-than-0.5-gram quantity that 21 C.F.R. § 101.9(c)(6)(ii) permits to be expressed as zero.

16. Accordingly, Plaintiffs bring claims against Defendants for violations of: (1) California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*; (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; (3) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*; (4) Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*; (5) Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, *et seq.*; (6) breach of express warranty; (7) unjust enrichment, and (8) common law fraud.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because the proposed Classes include more than 100 members, the aggregate claims of the proposed Classes exceed $5,000,000, exclusive of interest and costs, and at least one member of the proposed Classes is a citizen of a state different from Defendants. This Court has

---

Heatwave, and Melon Paradise varieties added thereafter, in all sizes. See Dunkin', Dunkin' Zero, https://www.dunkindonuts.com/menu/categories/iced-refreshers-specialtytea/specialty/dunkin-zero/ (last visited Sept. 23, 2026); Dunkin', Allergen and Ingredient Guide (Aug. 19, 2026) ("Ingredient Guide"), https://www.dunkindonuts.com/nutrition/ (last visited Oct. 15, 2026). Discovery may reveal that additional products of Defendants are within the scope of Plaintiff's Complaint. Accordingly, Plaintiff reserves the right to amend her Complaint to add additional products of Defendants.

supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

4. This Court has general personal jurisdiction over Defendant Dunkin' Brands, Inc. because it maintains its principal place of business at 130 Royall Street, Canton, Massachusetts, within this District, and is therefore at home in this Commonwealth. This Court also has specific personal jurisdiction over Dunkin' Brands, Inc. because Plaintiff's claims arise out of and relate to conduct which it undertook in Massachusetts, including the formulation and naming of the Products and the creation, approval, and dissemination of the Zero Sugar Representations. This Court also has specific personal jurisdiction over Defendant Inspire Brands, Inc. because it purposefully directs Dunkin' Brand's marketing, advertising, and menu development through Dunkin' Brands, Inc.'s Canton, Massachusetts headquarters, issued the Zero Sugar Representations from Boston, Massachusetts, and derives substantial revenue from the sale of the Products in Massachusetts, such that Plaintiff's claims arise out of and relate to its contacts with this Commonwealth.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and (c)(2) because Defendant Dunkin' Brands, Inc. resides in this District and a substantial part of the events giving rise to Plaintiff's claims, including the design, approval, and dissemination of the Zero Sugar Representations, occurred in this District. Pursuant to Local Rule 40.1(d)(1)(C), this action is properly assigned to the Eastern Division because the only party residing in this District, Dunkin' Brands, Inc., resides in Norfolk County.

## PARTIES

6. Plaintiff Priscila Alvarez is a citizen of Massachusetts residing in New Bedford, Massachusetts. Plaintiff Alvarez purchased Defendants' Tropical Mango flavored Product for her

personal use from a Dunkin store located in New Bedford, Massachusetts in or around Summer 2026 for approximately $4.30. Prior to making her purchase, Plaintiff reviewed and relied upon Defendants' "Zero Sugar" representations when purchasing the Product. Before each purchase, Plaintiff saw and relied on Defendants' representations, on Dunkin's menu boards and signage, and in Dunkin's advertising, that the Products are "Dunkin' Zero," "zero sugar" beverages containing "0g of sugar." Based on these representations, Plaintiff reasonably believed the Products contained zero sugar. The Zero Sugar Representations were part of the basis of Plaintiff's bargain. She paid a price premium and would not have purchased the Product, or would have paid less for it, had she known that it contained sugar. Plaintiff also paid a price premium because of Defendants' false and misleading Sugar Representations but did not receive the benefit of her bargain. Defendants knew they could charge more for the Products by falsely advertising them as zero sugar, and did so.

7. Plaintiff Alvarez remains interested in purchasing beverages that truly contain no sugar. However, she cannot know for certain whether Defendants' false labeling and marketing have been or will be corrected, and the Products' composition may change over time. If Defendants continues to make the Zero Sugar Representations, Plaintiff will be unable to make informed purchasing decisions and is likely to be misled again unless Defendants are required to ensure that the Products' marketing is accurate. Plaintiff is an average consumer who is not sophisticated in the chemistry, manufacturing, or formulation of food products. Neither Plaintiff nor reasonable consumers have the specialized knowledge needed to determine independently whether allulose is a sugar.

8. Plaintiff Eunice De La Pena is a citizen of Illinois residing in Harwood Heights, Illinois. Plaintiff De La Pena purchased Defendants' Tropical Mango flavored Product for her

personal use from a Dunkin store located in Skokie, Illinois in or around Spring 2026 at a price between $3-$4. Prior to making her purchase, Plaintiff reviewed and relied upon Defendants' "Zero Sugar" representations when purchasing the Product. Before each purchase, Plaintiff saw and relied on Defendants' representations, on Dunkin's menu boards and signage, and in Dunkin's advertising, that the Products are "Dunkin' Zero," "zero sugar" beverages containing "0g of sugar." Based on these representations, Plaintiff reasonably believed the Products contained zero sugar. The Zero Sugar Representations were part of the basis of Plaintiff's bargain. She paid a price premium and would not have purchased the Product, or would have paid less for it, had she known that it contained sugar. Plaintiff also paid a price premium because of Defendants' false and misleading Sugar Representations but did not receive the benefit of her bargain. Defendants knew they could charge more for the Products by falsely advertising them as zero sugar, and did so.

9. Plaintiff De La Pena remains interested in purchasing beverages that truly contain no sugar. However, she cannot know for certain whether Defendants' false labeling and marketing have been or will be corrected, and the Products' composition may change over time. If Defendants continues to make the Zero Sugar Representations, Plaintiff will be unable to make informed purchasing decisions and is likely to be misled again unless Defendants are required to ensure that the Products' marketing is accurate. Plaintiff is an average consumer who is not sophisticated in the chemistry, manufacturing, or formulation of food products. Neither Plaintiff nor reasonable consumers have the specialized knowledge needed to determine independently whether allulose is a sugar.

10. Plaintiff Charlene Yates is a citizen of California residing in San Mateo, California. Plaintiff Yates purchased Defendants' Juicy Peach, Glamberry, and Blackberry Tangerine flavored

Products for her personal use from a Dunkin store located in California on multiple occasions, including in or around the Spring and Summer of 2026 at a price between $3-$5. Prior to making her purchases, Plaintiff reviewed and relied upon Defendants' "Zero Sugar" representations when purchasing the Product. Before each purchase, Plaintiff saw and relied on Defendants' representations, on Dunkin's menu boards and signage, and in Dunkin's advertising, that the Products are "Dunkin' Zero," "zero sugar" beverages containing "0g of sugar." Based on these representations, Plaintiff reasonably believed the Products contained zero sugar. The Zero Sugar Representations were part of the basis of Plaintiff's bargain. She paid a price premium and would not have purchased the Product, or would have paid less for it, had she known that it contained sugar. Plaintiff also paid a price premium because of Defendants' false and misleading Sugar Representations but did not receive the benefit of her bargain. Defendants knew they could charge more for the Products by falsely advertising them as zero sugar, and did so.

11. Plaintiff Yates remains interested in purchasing beverages that truly contain no sugar. However, she cannot know for certain whether Defendants' false labeling and marketing have been or will be corrected, and the Products' composition may change over time. If Defendants continues to make the Zero Sugar Representations, Plaintiff will be unable to make informed purchasing decisions and is likely to be misled again unless Defendants are required to ensure that the Products' marketing is accurate. Plaintiff is an average consumer who is not sophisticated in the chemistry, manufacturing, or formulation of food products. Neither Plaintiff nor reasonable consumers have the specialized knowledge needed to determine independently whether allulose is a sugar.

12. Defendant Dunkin' Brands, Inc. is a Delaware corporation with its principal place of business at 130 Royall Street, Canton, Massachusetts 02021. Dunkin' Brands, Inc. owns,

operates, and franchises the Dunkin' brand in the United States; develops and formulates the beverages sold under the Dunkin' name, including the Products; and creates, approves, and disseminates the menu boards, signage, websites, mobile ordering content, press releases, and advertising through which the Products are marketed and sold at Dunkin' restaurants throughout the United States, including in Massachusetts, California, and Illinois. Dunkin' Brands, Inc. operates the dunkindonuts.com website on which the Zero Sugar Representations appear and is the entity that Dunkin' identifies to consumers as the provider of its programs and online services.

13. Defendant Inspire Brands, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia. Inspire Brands, Inc. acquired Dunkin' Brands Group, Inc. and its subsidiaries, including Dunkin' Brands, Inc., in December 2020, and since that time has owned, controlled, and directed the Dunkin' brand. Inspire Brands, Inc. participates in and approves the formulation, naming, advertising, marketing, and sale of the Products, and issued the press releases announcing and describing the Products as "zero-sugar" energy drinks.

14. Defendants act directly and through their parents, subsidiaries, affiliates, agents, and franchisees, including their affiliates Dunkin' Donuts Franchising LLC, Dunkin' Donuts LLC, and DD IP Holder LLC, and the franchisees that operate Dunkin' restaurants under Defendants' uniform brand, menu, and marketing standards. At all relevant times, Defendants controlled and approved the formulation, naming, labeling, advertising, and marketing of the Products, and the acts of Defendants' parents, subsidiaries, affiliates, agents, and franchisees in marketing and selling the Products as alleged herein were undertaken at Defendants' direction and on Defendants' behalf. Plaintiff reserves the right to amend this Complaint to name additional parent, subsidiary, or affiliated entities as discovery may warrant.

15. Defendants market and sell the Products throughout the United States, including Massachusetts and Illinois, through Dunkin' restaurant locations. Defendants authorized and disseminated the allegedly false and misleading "Zero Sugar" representations used to advertise and promote the Products to consumers nationwide, including in Massachusetts, California, and Illinois.

## FACTUAL ALLEGATIONS

### A. Consumers Seek Out and Pay More for Products That Contain No Sugar

16. Consumer demand for products without sugar is well documented. A 2022 nationwide survey found that 73% of Americans ages 18 to 80 reported trying to limit or avoid sugars.[2]

17. That demand accords with widespread public-health guidance. The 2025–2030 Dietary Guidelines for Americans state that no amount of added sugars is recommended or considered part of a healthy or nutritious diet and that one meal should contain no more than 10 grams of added sugars. The World Health Organization recommends limiting free sugars to less than 10 percent of total daily energy intake and states that limiting them further to 5 percent or less may provide additional health benefits. The American Heart Association recommends limiting added sugars to no more than 6 percent of daily calories.[3]

[2] INTERNATIONAL FOOD INFORMATION COUNCIL, *2022 Food & Health Survey 57* (May 18, 2022), https://ific.org/wp-content/uploads/2022/06/IFIC-2022-Food-and-Health-Survey-Report-May-2022.pdf.

[3] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES & U.S. DEPARTMENT OF AGRICULTURE, DIETARY GUIDELINES FOR AMERICANS, 2025–2030, at 5 (Jan. 2026), https://cdn.realfood.gov/DGA.pdf; WORLD HEALTH ORGANIZATION, *Healthy Diet* (Jan. 26, 2026), https://www.who.int/news-room/fact-sheets/detail/healthy-diet; AMERICAN HEART ASSOCIATION, *Added Sugars* (last reviewed Aug. 2, 2024), https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/sugar/added-sugars.

18. Food and beverage manufacturers are acutely aware of this demand and of the premium consumers will pay to satisfy it. Products labeled "sugar free" and "zero sugar" command higher prices than comparable products that do not bear those claims, and manufacturers reserve the front principal display panel of their packaging for the claims they believe will most motivate a purchase.

19. Defendants have capitalized on that demand. It markets drinks that contain gram-scale quantities of allulose, a sugar, while labeling and advertising them as containing "Zero Sugar" and "Og of Sugar." Defendants thereby obtained an unfair competitive advantage over competitors whose no-sugar claims are true, at the expense of unwitting consumers.

20. Indeed, reasonable consumers understand the phrase "0g of Sugars" and "Zero Sugar" in the ordinary, everyday sense: 0g, meaning "zero grams," and sugars meaning that they "include sugars naturally present in many nutritious foods and beverages, such as sugar in milk and fruits as well as any added sugars that may be present in the product."[4]

**B. Defendant's Zero Sugar Representations and Warranties**

21. On March 4, 2026, Defendants announced the nationwide launch of the Products through a press release titled "Dunkin'® Introduces Dunkin' Zero, A Zero-Sugar Energy Drink Made for Everyday Momentum." In promoting the Products, Defendants characterized Dunkin' Zero as "a zero-sugar energy drink made for the in-between moments of the day" and emphasized that a medium-sized beverage contains "20 calories" and "zero grams of sugar." The press release further reinforced these representations under the heading "Meet Dunkin' Zero: Six Flavors. Zero Sugar. All-Day Energy," and featured a statement from Dunkin's chief marketing officer

[4] U.S. FOOD AND DRUG ADMINISTRATION, *Sugars on the Nutrition Facts Label, available at* https://www.fda.gov/media/135299/download (last accessed August 17, 2026).

describing the Products as offering "zero sugar energy that delivers bold flavor without compromise."


News Releases > What's New > March 04, 2026

**DUNKIN'® INTRODUCES DUNKIN' ZERO, A ZERO-SUGAR ENERGY DRINK MADE FOR EVERYDAY MOMENTUM**

DUNKIN' Zero
ZERO SUGAR ENERGY

*New Dunkin' Zero debuts alongside craveable banana-inspired sips, an all-new Berry Acai Refresher and the return of the $6 Meal Deal*

**BOSTON (March 4, 2026)** – Dunkin' is bringing a new kind of energy to the menu. Starting today, the brand introduces **Dunkin' Zero**, a zero-sugar energy drink made for the in-between moments of the day, when coffee has done its job but the day is far from over.

Available in six bold, fruit-forward flavors, Dunkin' Zero delivers 20 calories in a medium and zero grams of sugar. It's a crisp, lightly carbonated sip made for moments when guests want to reset and keep moving. For many, Dunkin' is how the morning starts. Dunkin' Zero picks it up from there, keeping the day going between meetings, on the go, in the carpool line – and into whatever comes next.

**Meet Dunkin' Zero: Six Flavors. Zero Sugar. All-Day Energy**

Dunkin' Zero brings bright, fruit-forward flavor that keeps every sip light and delicious. It's available in six varieties:

**STAY CONNECTED**

Get Dunkin' stories and news delivered to your inbox.

Enter your email | Subscribe

22. Defendants' website repeats the representation for the Product line and for every individual variety. The Dunkin' Zero menu page states: "Available in six flavors, Dunkin' Zero is packed with delicious flavor with 0g of sugar, 145mg of caffeine, and 20 calories in a medium."




23. Defendants further reinforce the Products' "zero-sugar" misrepresentation through their blog, social media platforms, in-store and drive-through menu boards, and other promotional materials, consistently describing the Products as "zero sugar," "0 sugar," or containing "0g of sugar." These representations are further emphasized by the "Dunkin' Zero" name itself, which conveys to consumers that the Products contain no sugar. Representative examples of Defendants' promotional materials appear below, which can be found in store and in the drive thru line and menu:




24. Drive thru menus at Dunk restaurants capitalize on the advertisements as well:



25. The Representations communicate to reasonable consumers that the Products contain no sugar. That is the plain and ordinary meaning of “Zero Sugar”, and “0g Sugar.”

26. Contrary to Defendants’ representations, the Products contain allulose, as confirmed by Defendants’ own Allergen and Ingredient Guide. According to the Guide, each Dunkin' Zero beverage contains sparkling water and one or more flavored syrups that list allulose immediately after water in their ingredient statements. For instance, the Guide identifies the ingredients in the Blackberry Tangerine Dunkin’ Zero as follows: “Sparkling Water; Blackberry Tango Energy Zero Sugar Flavored Syrup: Water, Allulose, Contains 2% or less of: Natural Flavors, Citric Acid, Guarana Seed Blend (Maltodextrin, Guarana Seed Extract, Caffeine), Taurine, Sodium Citrate, Fruit & Vegetable Juice (Color), Potassium Sorbate (Preservative), Steviol Glycosides, Xanthan Gum, Vitamin/Mineral Blend . . .”[5]

| | |
|---|---|
| PRODUCT NAME | Blackberry Tangerine Dunkin' Zero - Large |
| CATEGORY | Dunkin' Zero Beverages |
| FLAVOR | Blackberry |
| INGREDIENTS | Sparkling Water; Blackberry Tango Energy Zero Sugar Flavored Syrup: Water, Allulose, Contains 2% or less of: Natural Flavors, Citric Acid, Guarana Seed Blend (Maltodextrin, Guarana Seed Extract, Caffeine), Taurine, Sodium Citrate, Fruit & Vegetable Juice (Color), Potassium Sorbate (Preservative), Steviol Glycosides, Xanthan Gum, Vitamin/Mineral Blend (Pyridoxine Hydrochloride, Cyanocobalamin, Calcium D-pantothenate, Niacinamide Manganese Citrate, Zinc Sulfate, Maltodextrin). |
| ALLERGENS | |

[5] The Ingredient Guide is published by Dunkin’ at https://www.dunkindonuts.com/nutrition/ (last visited Oct. 15, 2026) and is the written ingredient information Dunkin’ makes available to consumers for the Products. See also https://assets.ctfassets.net/ubkcphxhphh0/4M2wXyC5B3yPyD5DlI4MHA/84696105765eb3f1b77160de9f70da36/DD_W7_allergy_ingredient_guide.pdf (last visited Oct. 15, 2026)

| | |
|---|---|
| PRODUCT NAME | Blushpop Dunkin' Zero - Large |
| CATEGORY | Dunkin' Zero Beverages |
| FLAVOR | Blushpop |
| INGREDIENTS | Sparkling Water; Tropical Energy Zero Flavored Syrup: Water, Allulose, Natural Flavors, Contains 2% or less of: Citric Acid, Guarana Seed Blend (Maltodextrin, Guarana Seed Extract, Caffeine), Taurine, Sodium Citrate, Potassium Sorbate (Preservative), Steviol Glycosides, Beta Carotene (Color), Xanthan Gum, Vitamin/Mineral Blend (Pyridoxine Hydrochloride, Cyanocobalamin, Calcium D-Pantothenate, Niacinamide, Manganese Citrate, Zinc Sulfate, Maltodextrin); Blackberry Tango Energy Zero Flavored Syrup: Water, Allulose, Contains 2% or less of: Natural Flavors, Citric Acid, Guarana Seed Blend (Maltodextrin, Guarana Seed Extract, Caffeine), Taurine, Sodium Citrate, Fruit and Vegetable Juice (Color), Potassium Sorbate (Preservative), Steviol Glycosides, Xanthan Gum, Vitamin/Mineral Blend (Pyridoxine Hydrochloride, Cyanocobalamin, Calcium D-pantothenate, Niacinamide Manganese Citrate, Zinc Sulfate, Maltodextrin). |

27. Defendants' Nutrition Guide further reflects the carbohydrate content of the Products. Specifically, the Guide identifies a medium Blackberry Tangerine Dunkin' Zero as containing 9 grams of Total Carbohydrate, 1 gram of Dietary Fiber, and 20 calories, while a large contains 12 grams of Total Carbohydrate and 25 calories. Depending on the flavor and serving size, the remaining varieties contain between 8 and 13 grams of Total Carbohydrate. Because allulose is listed as a principal ingredient in the Products' flavored syrups, and the Products contain relatively small amounts of other carbohydrate-contributing ingredients, Plaintiff alleges, on information and belief, that a substantial portion of the declared carbohydrate content is attributable to allulose. Accordingly, on information and belief, each medium Product contains approximately 8 to 10 grams of allulose, while each large contains approximately 11 to 13 grams. Nevertheless, Defendants' Nutrition Guide reports "0" grams of Total Sugars and "0" grams of Added Sugars for every Product.[6]

28. "Sugar-Free" is an absolute, objective, and quantitative claim concerning a measurable physical attribute of the Products. Federal law permits that claim only when a product contains less than 0.5 grams of sugar per reference amount customarily consumed and per labeled serving, together with the regulation's other requirements. The Products' "0g" Nutrition Facts

[6] https://assets.ctfassets.net/ubkcphxhphh0/3qEP8wMU2IFmLsLyEeWLuc/7bdae361f785d1611d25c4d859f8c721/DD_W7_nutrition_guide.pdf (last visited Oct. 15, 2026)

declarations further reinforce the no-sugar message to consumers, making it impossible for consumers to discover that the Products do, in fact, contain sugar.

### C. **Allulose Is a Sugar**

29. Allulose is a sugar.

30. Chemically, allulose is a monosaccharide. It is the C-3 epimer of D-fructose, meaning that allulose and fructose have the same molecular formula and connectivity but differ in the spatial orientation of a hydroxyl group at the third carbon. "D-allulose, a C-3 epimer of D-fructose, is a rare monosaccharide used as a food ingredient or a sweetener."[7] Allulose is accordingly "a rare sugar," and "a monosaccharide that is low in calories and that maintains approximately 70% of sweetness relative to sugar."[8]

31. Allulose is not merely a sugar as a matter of chemical classification. It is used as one. Allulose has "70% of the sweetness of sucrose, which means it is viewed as a potential alternative sweetener."[9] The food science literature describes allulose and other rare sugars as "monosaccharides with sweetness similar to those as caloric sugars, but [with] low caloric values," which "are now widely used as sugar substitutes."[10]

32. Because allulose is less sweet than table sugar, it is used in gram-scale quantities as a bulk sweetener. High-intensity sweeteners such as saccharin, aspartame, acesulfame potassium, neotame, sucralose, and advantame are approximately 200 to 20,000 times as sweet as

---

[7] Han-Joo Maeng et al., *Metabolic Stability of D-Allulose in Biorelevant Media and Hepatocytes: Comparison with Fructose and Erythritol*, 8 FOODS ART. 448, at 1 (2019), https://doi.org/10.3390/foods8100448.

[8] Youngji Han et al., *Gastrointestinal Tolerance of D-Allulose in Healthy and Young Adults. A Non-Randomized Controlled Trial*, 10 NUTRIENTS ART. 2010, at 1–2 (2018), https://doi.org/10.3390/nu10122010.

[9] Maeng et al., *supra* note 9, at 2.

[10] Maeng et al., *supra* note 9, at 9–10.

sucrose. By contrast, allulose has approximately 70% of sucrose's sweetness and, as the Products' own labels show, is used in large quantities as a bulk sweetener. The Products use between 5 and 10 grams of allulose per labeled serving. Plaintiff Mirzaian's Fruity Product contained 10 grams in a 38-gram labeled serving—approximately 26.3% of the serving by weight.[11][12]

33. Allulose also behaves like sugar in food. "It is convenient for the food industry to use D-allulose, as its chemical properties are similar to those of fructose in terms of solubility, water activity, and viscosity."[13] It is used as "a partial replacement of added sugars."[14] Allulose is "widely regarded as a promising substitute for sucrose"—that is, a substitute for table sugar, and one that is itself a sugar.[15]

34. The Food and Drug Administration ("FDA") identifies allulose as a sugar. In its 2016 Nutrition Facts rulemaking, the FDA stated that allulose, "as a monosaccharide, must be included" in the Total Sugars declaration pending any future rulemaking that would otherwise exclude the substance.[16] The current regulation continues to define Total Sugars as "the sum of all free mono- and disaccharides" and does not exclude allulose. 21 C.F.R. § 101.9(c)(6)(ii).

---

[11] U.S. Food & Drug Administration, *Aspartame and Other Sweeteners in Food*, https://www.fda.gov/food/food-additives-petitions/aspartame-and-other-sweeteners-food (last visited Aug. 18, 2026).

[12] Mengting Tao, Wenli Zhang & Wanmeng Mu, *D-Allulose: A New Generation of Potential Bulk Sweeteners in the Food Industry*, 73 J. Agric. & Food Chem. 27,833, 27,833–35 (2025) (Viewpoint), https://doi.org/10.1021/acs.jafc.5c13620.

[13] Han et al., *supra* note 10, at 10.

[14] *Id.*

[15] Wenli Zhang et al., *D-Allulose, a Versatile Rare Sugar: Recent Biotechnological Advances and Challenges*, 63 Critical Revs. Food Sci. & Nutrition 5661, 5661 (2023) (published online Dec. 29, 2021), https://doi.org/10.1080/10408398.2021.2023091.

[16] Food Labeling: Revision of the Nutrition and Supplement Facts Labels, 81 Fed. Reg. 33,742, 33,796 (May 27, 2016).

35. The Calorie Control Council likewise describes allulose under the heading "Allulose is a Naturally Occurring Sugar" and states that "[a] monosaccharide, or simple sugar, allulose is absorbed by the body, but not metabolized, so it is nearly calorie-free."[17]

**D. <u>The Products Violate the FDA Nutrient Content Regulations</u>**

36. Congress empowered the FDA to oversee and regulate food labeling by enacting the Federal Food, Drug, and Cosmetic Act, as amended by the Nutrition Labeling and Education Act, 21 U.S.C. § 301 *et seq.* FDA promulgated the relevant food-labeling regulations in 21 C.F.R. part 101.

37. Section 101.9(c)(6)(ii) requires a Total Sugars declaration here and defines Total Sugars as "the sum of all free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose)." It permits Total Sugars to be expressed as zero only when a serving contains less than 0.5 gram of sugars. Allulose is a free monosaccharide, and the binding regulation contains no allulose exception.

38. FDA regulations distinguish information appearing within the Nutrition Facts panel from statements appearing elsewhere on the label or in labeling of foods. Information within the Nutrition Facts panel is not itself a nutrient-content claim, but the same information placed outside that panel is subject to the nutrient-content-claim regulations. 21 C.F.R. § 101.13(c). Defendants' labeling of "0g of Sugar" and "Zero Sugar" statements appears outside the Nutrition Facts panel and is a quantitative statement of nutrient amount governed by § 101.13(i)(3), which permits such a statement only if it is not false or misleading. FDA itself identifies "0 g total sugars" as an amount

[17] Calorie Control Council, Allulose, https://caloriecontrol.org/ingredients/sweeteners/allulose/ (last visited Aug. 11, 2026).

statement described by § 101.13(i)(3).[18] Under § 101.13(o), compliance is determined using the analytical methodology prescribed by § 101.9, including the applicable compliance provisions in § 101.9(g).

39. The permissibility of a declaration inside the Nutrition Facts panel does not determine whether the same numerical statement is false or misleading when used elsewhere as a nutrient-content claim. Nutrient content claims are strictly forbidden unless specifically allowed under FDA regulations. 21 C.F.R. § 101.13(b) ("A claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling under § 101.9 or under § 101.36 (that is, a nutrient content claim) may not be made on the label or in labeling of foods unless the claim is made in accordance with this regulation and with the applicable regulations in subpart D . . . .").

40. Within Subpart D, section 101.60(c)(1) specifically governs the use of the "sugar free" and "Sugar Free" nutrient content claims at issue in this case. That regulation provides that terms such as "sugar free", "free of sugar", "no sugar", "Sugar Free", "without sugar", "sugarless", and "trivial source of sugar" may not be used on the label or in labeling of a food unless, among other requirements:

> (i) The food contains less than 0.5 g of sugars, as defined in §101.9(c)(6)(ii), per reference amount customarily consumed and per labeled serving...; and
>
> (ii) The food contains no ingredient that is a sugar or that is generally understood by consumers to contain sugars unless the listing of the ingredient in the ingredient statement is followed by an asterisk that refers to the statement below the list of ingredients, which states "adds a trivial amount of sugar," "adds a negligible amount of sugar," or "adds a dietarily insignificant amount of sugar."

[18] *See* U.S. FOOD & DRUG ADMINISTRATION, *Industry Resources on the Changes to the Nutrition Facts Label*, https://www.fda.gov/food/nutrition-food-labeling-and-critical-foods/industry-resources-changes-nutrition-facts-label.

41. 21 C.F.R. § 101.60(c)(1)(i)–(ii). These quoted requirements are conjunctive; each must be satisfied.

42. The Products do not comply with these regulations. To determine the amount of sugar in a food, section 101.60(c)(1)(i) cross-references 21 C.F.R. § 101.9(c)(6)(ii), which provides that "[t]otal sugars shall be defined as the sum of all free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose)." Allulose, as a monosaccharide epimer of fructose, falls squarely within that definition. The allulose in the Products must, therefore, be included when calculating the amount of sugars for purposes of the 0.5-gram threshold in section 101.60(c)(1)(i).

43. The Products' labeling also violates 21 C.F.R. § 101.60(c)(1)(ii). That provision prohibits a sugar-free-type claim when the food contains an ingredient that is a sugar or is generally understood by consumers to contain sugars, unless the listing of that ingredient is followed by a marker referring to one of the prescribed statements that the ingredient adds a trivial, negligible, or dietarily insignificant amount of sugar. The Products' ingredient statement does not mark allulose. That omission violates subsection (ii) independently of the amount-based defect under subsection (i), if the comparison-panel language is construed as one of the sugar-free-type claims governed by § 101.60(c)(1).

44. The FDA's 2016 final rule stated that allulose, as a monosaccharide, must be included in the Total Sugars declaration. Food Labeling: Revision of the Nutrition and Supplement Facts Labels, 81 Fed. Reg. 33,742, 33,796 (May 27, 2016). The regulation still defines Total Sugars as the sum of all free mono- and disaccharides and contains no allulose exception. 21 C.F.R. § 101.9(c)(6)(ii).

45. In October 2020, the FDA issued nonbinding guidance announcing its intent, pending rulemaking, to exercise enforcement discretion for manufacturers that exclude allulose

from the gram amounts of Total Sugars and Added Sugars, and from the Added Sugars percentage Daily Value, declared on Nutrition and Supplement Facts labels. The guidance did not amend § 101.9, redefine Total Sugars, or rescind legally enforceable rights or responsibilities. See 21 C.F.R. § 10.115(d)(1).[19]

46. The Seventh Circuit recently confirmed each of these points. In *Franco v. Chobani, LLC*, No. 25-2087, 184 F.4th 599 (7th Cir. 2026), the court reversed the dismissal of state consumer-protection claims challenging "Zero Sugar" yogurt sweetened with four grams of allulose per serving. The court held that because the definition in § 101.9(c)(6)(ii) "includes every monosaccharide and the following parenthetical is merely a list of examples, allulose is a sugar under § 101.9(c)(6)(ii)." *Id.* at *605. The FDA, appearing as amicus curiae at the court's invitation, "took the position that the text of § 101.9(c)(6)(ii) is unambiguous" and that Total Sugars as defined in that regulation include every monosaccharide, including allulose. *Id.*

47. The Seventh Circuit further held that the FDA's October 2020 Allulose Guidance does not alter that conclusion, because "[t]he Allulose Guidance isn't an interpretation of § 101.9(c)(6)(ii)"; rather, "it's an announcement of a change in enforcement policy." *Id.* at *4. Because the plaintiffs sought to hold the manufacturer liable under state law "for violating identical standards," their claims were not preempted. *Id.* at *5 (citing 21 U.S.C. § 343-1(a)(5)). The court also held that, "given the absolute promise on Chobani's products (sugar free)," the allegation that reasonable consumers were deceived was not implausible, *id.* at *5–6, and that "the fact that one sovereign (the United States) indicated that it would not enforce its labeling requirements with respect to allulose should not have led Chobani to believe that the states would take a similar

[19] U.S. Food & Drug Administration, *The Declaration of Allulose and Calories from Allulose on Nutrition and Supplement Facts Labels: Guidance for Industry* 1, 8–9 (Oct. 2020), https://www.fda.gov/media/123342/download.

approach," because "the FDA's decisions about its enforcement priorities would not immunize the company from suits based on state law." *Id.* at *5.

48. Because the Products' labels bear false or misleading outside-panel nutrient-content claims, the Products are "misbranded" under federal law. 21 U.S.C. § 343(a)(1), (r)(1)(A); 21 C.F.R. § 101.13(c), (i)(3), (j), and (o), applying the Total Sugars definition and zero threshold in § 101.9(c)(6)(ii), together with § 101.12(b); and, in the alternative, § 101.60(c)(1).

49. Plaintiffs do not seek to enforce the FDCA or its implementing regulations directly. Plaintiffs seek relief under independently enforceable state consumer-protection, warranty, and common-law causes of action. The FDCA's express preemption provision, 21 U.S.C. § 343-1(a), permits states to impose food-labeling requirements identical to the federal requirements, and Plaintiffs' state-law claims seek to impose requirements identical to those federal requirements. Plaintiffs' claims are therefore not preempted.

## E. Defendants' Conduct Violates California's Food Labeling Laws

50. Defendants' marketing, advertising, distribution, and sale of the Products violate the misbranding provisions of California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 *et seq.* (the "Sherman Law"), which adopts federal food-labeling regulations as California regulations. Cal. Health & Safety Code § 110100(a); see also *id.* § 110670.

51. Defendants' marketing, advertising, distribution, and sale of the Products violate the Sherman Law's misbranding provisions, including:

(a) Section 110660 (a food is misbranded if its labeling is false or misleading in any particular);

(b) Section 110670 (a food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims set forth in 21 U.S.C. § 343(r));

(c) Section 110760 (making it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded);

(d) Section 110765 (making it unlawful for any person to misbrand any food); and

(e) Section 110770 (making it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food).

52. Defendants' marketing, advertising, distribution, and sale of the Products also violate the Sherman Law's false-advertising provisions, including:

(a) Section 110390, which prohibits dissemination of food advertisements that are false or misleading in any particular;

(b) Section 110395 (making it unlawful to manufacture, sell, deliver, hold, or offer to sell any falsely or misleadingly advertised food); and

(c) Sections 110398 and 110400 (making it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised).

53. Because the Products make false or misleading sugar claims, the Products are misbranded under California law, and Defendants' advertising, distribution, and sale of the Products are unlawful.

## F. <u>Defendants' Conduct Violates Illinois' Food Labeling Laws</u>

54. The Illinois Food, Drug and Cosmetic Act ("IFDCA"), 410 ILCS 620/1 et seq., prohibits the misbranding of food sold in Illinois. Under 410 ILCS 620/11(a), "[a] food is misbranded" if "its labeling is false or misleading in any particular."

55. In determining whether labeling or advertising is misleading, Illinois law requires consideration of "not only representations made or suggested by statement, word, design, device, sound or any combination thereof," but also whether the labeling or advertising fails to disclose material facts in light of the representations made. 410 ILCS 620/2.11.

56. The IFDCA also incorporates applicable federal food-labeling regulations into Illinois law. *See* 410 ILCS 620/21(j) ("[a] federal regulation automatically adopted pursuant to this Act takes effect in this State on the date it becomes effective as a Federal regulation."). Federal regulations provide that "sugars" include "all free mono- and disaccharides." 21 C.F.R. § 101.9(c)(6)(ii). Allulose is a monosaccharide and therefore constitutes a sugar under this regulatory definition.

57. Federal regulations further prohibit the use of the terms "Zero Sugar," "Sugar Free", "no sugar", or other terms having the same meaning unless the food contains less than 0.5 grams of sugars per reference amount customarily consumed and per labeled serving. 21 C.F.R. § 101.60(c)(1).

58. Defendants' representations are particularly misleading because they expressly communicate to consumers that the Products contain no sugar, when, in fact, they contain allulose, a sugar under the applicable regulatory definition. Dunkin therefore misrepresents the nature and sugar content of the Products and fails to disclose material facts necessary to prevent Defendant's "Zero Sugar " representations from misleading consumers. *See* 410 ILCS 620/2.11.

59. Accordingly, because the Products bear "Zero Sugar" nutrient-content claims despite containing allulose, the Products are misbranded under Illinois law. Defendant's advertising, distribution, and sale of the misbranded Products therefore violate the IFDCA and the food-labeling requirements incorporated into Illinois law.

60. Consumers are not required to conduct independent scientific testing or research into the chemical classification of listed ingredients to verify express label claims. Reasonable consumers do not possess specialized knowledge of carbohydrate chemistry. Defendants are responsible for ensuring that its express labeling and marketing claims are truthful and not misleading.

**E. <u>Reasonable Consumers Cannot Detect Defendants' Deception</u>**

61. Reasonable consumers have no reason to search the side or back panels when presented with the conspicuous representations and advertisements that the Products contain "0g of Sugar" and "Zero Sugar." Consumers are not expected to look beyond a misleading representation to discover that the representation is false.

62. Consumers are not required to conduct independent scientific testing or research into the chemical classification of listed ingredients to verify express label claims. Reasonable consumers do not possess specialized knowledge of carbohydrate chemistry. Defendants is responsible for ensuring that its express labeling and marketing claims are truthful and not misleading.

63. Allulose is not a household name. In a 2021 consumer survey, only 15% of respondents had even heard of allulose, let alone understood that it is a sugar.[20] Nor do reasonable consumers ordinarily scrutinize back- or side-panel ingredient disclosures: observational studies have found that only approximately 7.7% to 11.6% of shoppers look at the side or back panels of a product before placing it in their cart,[21] and the average shopper spends roughly 13 seconds selecting an item in-store.[22] Reasonable consumers therefore cannot be expected to discern from the Products' ingredient disclosures that the Products contain sugar.

## G. <u>Defendants Knew the Zero Sugar Representations Were False</u>

64. Defendants knew, or should have known, that the Zero Sugar Representations were false or misleading when it marketed, advertised, labeled, distributed, and sold the Products. Specifically, Defendants knew that: (a) the Products contain allulose; (b) allulose is a sugar; (c) the Products contain between 8-13 grams of allulose per labeled serving depending on size and flavor; (d) its labels nevertheless represent that the Products contain "0g of Sugar" and "Zero Sugar"; (e) reasonable consumers would rely on the Zero Sugar Representations when purchasing;

---

[20] INTERNATIONAL FOOD INFORMATION COUNCIL, *Perceptions and Use of Dietary Sweeteners* (May 2021), https://foodinsight.org/wp-content/uploads/2021/05/IFIC-Sweeteners-Survey.May-2021.pdf.

[21] Klaus Grunert et al., *Nutrition Knowledge, and Use and Understanding of Nutrition Information on Food Labels Among Consumers in the UK*, 55 Appetite 177, 179–81 (2010) (in-store observational study finding that only 11.6% of shoppers who placed a product in their cart looked at its side or back panels); Klaus Grunert et al., *Use and Understanding of Nutrition Information on Food Labels in Six European Countries*, 18 J. Pub. Health 261, 263, 266 (2010) (62.6% of respondents looked at front packaging; only 7.7% looked elsewhere on the packaging); Yael Benn et al., *What Information Do Consumers Consider, and How Do They Look for It, When Shopping for Groceries Online?*, 89 Appetite 265, 270 (2015) (online eye-tracking study finding only 3.3% of fixations on ingredient information).

[22] Peter R. Dickson & Alan G. Sawyer, *The Price Knowledge and Search of Supermarket Shoppers*, 54 J. Marketing 42, 42–53 (1990).

(f) consumers would not receive the represented benefit of the bargain; and (h) the Zero Sugar Representations enabled Defendants to charge a premium for the Products.

65. Defendants could have stopped using the Zero Sugar Representations or ensured that they were true.

### H. Defendant's Zero Sugar Representations Injured Plaintiffs and the Classes

66. Defendants concealed or failed to disclose material facts about the Products, including: (a) the true nature of the Products' ingredients; (b) the fact that allulose is used as a bulk sweetener; (c) the fact that the Products contain between 8-13 grams of allulose per labeled serving—10 to 20 times the 0.5-gram cutoff; (d) the fact that the Products contain sugar despite the Zero Sugar Representations; and (e) the fact that the Products are misbranded under federal, California, Illinois, and other state laws when advertised and sold bearing the Zero Sugar Representations.

67. As an immediate, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants injured Plaintiffs and the Class Members in that they: (a) paid money for products that were not as represented; (b) paid a premium price for products that were not as represented; (c) were deprived of the benefit of the bargain because the Products they purchased differed from what Defendants warranted; (d) purchased Products worth less than represented; (e) did not receive products that met the expectations Defendants created; (f) purchased Products they did not expect or consent to receive; and (g) purchased Products containing sugar despite intending to buy products represented to contain none.

68. Accordingly, Plaintiffs and the Class Members suffered injury in fact and lost money or property because of Defendants' wrongful conduct.

### I. Plaintiffs Lack an Adequate Remedy at Law

69. Plaintiffs lack an adequate remedy at law for the future harm described above. Damages cannot remedy Plaintiffs' inability to rely on Defendants' representations when deciding whether to purchase the Products in the future. Only injunctive relief requiring Defendants to cease or correct the misleading Zero Sugar Representations can address that prospective harm.

70. Equitable relief is also necessary because legal remedies may prove inadequate to provide complete relief, including restitution measured by the difference between the prices Plaintiffs and Class Members paid and the value of the Products as received, which may not be coextensive with damages.

71. Equitable relief is additionally appropriate because the statutes of limitations for the asserted causes of action vary.

72. The scope of actionable misconduct under the FAL and UCL is also broader than under the other causes of action asserted herein. The FAL and UCL prohibit Defendant's fraudulent marketing scheme. Plaintiffs' warranty and common-law claims are more limited, focusing on duties arising from Defendant's representations at the point of purchase. The UCL may also borrow statutory prohibitions that do not themselves create a private cause of action.

## CLASS ACTION ALLEGATIONS

73. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3). The proposed classes are defined below (collectively, the "Classes"):

> **Nationwide Class:** All persons in the United States who, during the maximum period of time permitted by law, purchased Defendants' Products for their personal use.

> **California Subclass:** All persons in the State of California who, during the maximum period of time permitted by law, purchased Defendants' Products for their personal use.
>
> **Illinois Subclass:** All persons in the State of Illinois who, during the maximum period of time permitted by law, purchased Defendant's Products for their personal use.

74. The Classes do not include: (1) Defendants or its officers or directors; (2) the Judge or Magistrate Judge assigned to this action; (3) the assigned Judge's or Magistrate Judge's staff and family; or (4) Plaintiffs' counsel or Defendants' counsel.

75. Plaintiffs reserve the right to amend the class definitions and add classes or subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

76. **Community of Interest:** There is a well-defined community of interest among members of the Classes, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

77. **Numerosity:** While the exact number of members of the Classes is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, upon information and belief, members of the Classes number at least in the thousands. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

78. **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes. These common legal and factual questions include, but are not limited to:

(a) Whether allulose is a sugar;

(b) Whether Defendants' Zero Sugar Representations were false or misleading;

(c) Whether reasonable consumers would understand Defendants' representations and warranties concerning the Products to be untrue and misleading;

(d) Whether Defendants' representations and warranties were material;

(e) Whether the Products are misbranded under federal law and, with respect to the California, Illinois, and Massachusetts Subclasses, under California, Illinois, and Masssachusetts law, respectively;

(f) Whether Defendants were unjustly enriched as a result of the unlawful conduct alleged in this Complaint;

(g) Whether Plaintiffs and the members of the Classes have suffered damages as a result of Defendants' actions and the amount of those damages;

(h) Whether Plaintiffs and the members of the Classes are entitled to statutory damages; and

(i) Whether Plaintiffs and the members of the Classes are entitled to attorneys' fees and costs.

79. With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendants violated California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*., California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq*., and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*.

80. **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Classes because Plaintiffs were exposed to Defendants' Zero Sugar Representations, reasonably relied on those representations, and suffered the same type of economic loss alleged for Class Members who purchased the Products.

81. **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate representatives because they have no interests adverse to those of the Classes, are committed to the vigorous prosecution of this action, and have retained skilled and experienced counsel.

82. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because the expense and burden of individual litigation make it economically unfeasible for members of the Classes to seek redress outside a class action. Even if Class Members could afford individual litigation, the resulting burden on the courts would be substantial. Individualized litigation would also create a risk of varying, inconsistent, or contradictory judgments and would magnify delay and expense by requiring multiple trials of the same factual issues. By contrast, maintaining this action as a class action with respect to some or all issues presents fewer management difficulties, conserves the resources of the parties and courts, and protects each Class Member's rights. Plaintiffs anticipate no difficulty in managing this action as a class action. Classwide relief is essential to compel compliance with applicable consumer-protection laws. Separate actions could also subject Defendants to inconsistent obligations.

83. **Injunctive and Declaratory Relief:** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the Classes, thereby making appropriate final injunctive and declaratory relief with respect to the Classes as a whole under Federal Rule of Civil

Procedure 23(b)(2). Unless a classwide injunction is issued, Defendants will continue to label, advertise, market, and sell the Products in an unlawful and misleading manner, and members of the Classes will continue to be misled and harmed.

84. **Risk of Inconsistent Adjudications:** Prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, warranting certification under Federal Rule of Civil Procedure 23(b)(1).

## CAUSES OF ACTION

### COUNT I
### Violation of California's Consumers Legal Remedies Act ("CLRA")
### Cal. Civ. Code § 1750 *et seq.*
### (On Behalf of Plaintiff Yates and the California Subclass)

85. Plaintiff Yates incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

86. Plaintiff Yates brings this claim on behalf of herself and the California Subclass against Defendants.

87. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have."

88. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

89. Civil Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

90. Defendants profited from sales of the falsely and deceptively advertised Products by representing that the Products contain "0g of Sugar" and Zero Sugar" even though they contain between 8 and 13 grams of allulose per labeled serving—10 to 20 times the 0.5-gram cutoff.

91. Defendants' wrongful business practices constituted, and still constitute, a continuing course of conduct in violation of the CLRA.

92. Plaintiffs and the California Subclass Members seek (1) reasonable costs and attorneys' fees; and (2) an order enjoining the unlawful acts and practices described herein pursuant to Cal. Civ. Code § 1780.

**<u>COUNT II</u>**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On Behalf of Plaintiff Yates and the California Subclass)**

93. Plaintiffs hereby incorporate by reference and re-allege the allegations contained in all preceding paragraphs of this Complaint.

94. Plaintiff Yates bring this claim individually and on behalf of the California Subclass against Defendants.

95. Defendants violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200–17210, by engaging in unfair, fraudulent, and unlawful business practices.

96. Plaintiffs have standing to pursue this claim because they suffered an injury in fact and lost money or property as a result of Defendants' conduct. Plaintiffs purchased Defendants' Products for personal use, relied on Defendant's representation that the Products contained "0g of Sugar" and "Zero Sugar" and spent money they otherwise would not have spent had they known the Products contained between 8 and 13 grams of allulose per serving.

97. The UCL defines unfair competition to "mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" Cal.

Bus. & Prof. Code § 17200. A business act or practice is "unlawful" if it violates any established state or federal law. A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of themselves and others similarly situated who are affected by the unlawful or unfair business practice or act.

98. Defendants' acts, as described above, constitute unlawful, unfair, and fraudulent business practices pursuant to California Business & Professions Code § 17200 *et seq*.

99. Defendants violated the UCL's proscription against engaging in **Unlawful Business** Practices through its violations of the FAL, Cal. Bus. & Prof. Code § 17500 *et seq*.; the CLRA, Cal. Civ. Code § 1770 *et seq*.; the Sherman Law, including, without limitation, Cal. Health & Safety Code §§ 110100, 110390, 110395, 110398, 110400, 110660, 110670, 110760, 110765, and 110770; and the federal food-labeling requirements adopted by the Sherman Law, including 21 U.S.C. § 343(a)(1) and (r)(1)(A) and 21 C.F.R. § 101.13(c), (i)(3), (j), and (o), applying the Total Sugars definition and zero threshold in § 101.9(c)(6)(ii), together with § 101.12(b).

100. Defendants have also violated the UCL's proscription against engaging in **Unfair Business Practices.** Defendants' acts, omissions, misrepresentations, practices, and nondisclosures as alleged herein also constitute unfair business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. Defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous. The gravity of Defendants' conduct outweighs any alleged benefits attributable to it. There is no utility in representing that drinks containing between 8 and 13 grams of allulose per

labeled serving contain "0g of Sugar" and "Zero Sugar." Furthermore, Defendants' false and misleading representations are detrimental to competitors offering drinks that either do not make similar claims or do not contradict those claims by sweetening their products with sugar. Defendants' misrepresentations and omissions therefore harm consumers and the market as a whole.

101. Defendants have also violated the UCL's proscription against engaging in **Fraudulent Business Practices**. A business act or practice is "fraudulent" under the UCL if members of the public are likely to be deceived. The Zero Sugar Representations were and are likely to deceive reasonable consumers into believing that the Products contain no sugar when, in fact, they contain between 8 and 13 grams of allulose, a sugar, per labeled serving. Plaintiff Yates and California Subclass Members were in fact deceived.

102. Plaintiff and the California Subclass Members suffered substantial injury by buying Products they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omissions about the presence and amount of sugar in the Products.

103. The gravity of the consequences of Defendants' conduct as described above outweighs any justification, motive, or reason therefor, particularly considering the available legal alternatives in the marketplace. Such conduct is immoral, unethical, or unscrupulous; it offends established public policy and is substantially injurious to Plaintiff Yates and the California Subclass Members.

104. Plaintiff Yates and the California Subclass Members could not reasonably have avoided their injury or known that the Products' prominent labeling and marketing were

inaccurate. Consumers lack the specialized knowledge to determine whether an ingredient such as allulose is a sugar.

105. Pursuant to California Business and Professions Code § 17203, Plaintiff Yates and the California Subclass Members seek restitution, attorneys' fees, and all other relief that the Court deems proper.

**COUNT III**
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500 *et seq*.**
**(On Behalf of Plaintiff Yates and the California Subclass)**

106. Plaintiffs hereby incorporate the foregoing allegations as if fully set forth herein.

107. Plaintiff Yates bring this claim on behalf of herself and the California Subclass against Defendants.

108. Defendants' acts and practices, as described herein, have deceived or are likely to deceive members of the California Subclass and the public. Defendants represent that the Products contain "0g of Sugar" and "Zero Sugar" even though they contain between 8 and 13 grams of allulose per labeled serving—10 to 20 times the 0.5-gram cutoff.

109. Defendants have disseminated uniform advertising regarding the Products throughout California and the United States. The advertising was unfair, deceptive, untrue, or misleading within the meaning of Cal. Bus. & Prof. Code § 17500 and was intended and likely to deceive consumers.

110. Defendants' above-described advertising is likely to deceive because Defendants affirmatively represents that the Products contain "0g of Sugar" and "Zero Sugar."

111. In making and disseminating these statements, Defendants knew, or should have known, that its advertising was untrue or misleading. Plaintiff Yates and the California Subclass

based their purchasing decisions on Defendants' materially false Zero Sugar Representations and were injured in fact and lost money or property as a result.

112. Defendants' misrepresentations concerning the material facts described above constitute false and misleading advertising and therefore violate Cal. Bus. & Prof. Code § 17500 *et seq*.

113. Plaintiff Yates and the California Subclass Members seek restitution, attorneys' fees, and all other relief that the Court deems proper.

**<u>COUNT IV</u>**
**Violation of Illinois' Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. 505/1 *et seq.***
**(On Behalf of Plaintiff De La Pena and the Illinois Subclass)**

114. Plaintiff De La Pena hereby incorporates the foregoing paragraphs as if fully set forth herein.

115. Plaintiff De La Pena brings this claim on behalf of herself and the Illinois Subclass against Defendants.

116. Plaintiff and the Illinois Subclass Members, and Defendants, are "persons" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). 815 Ill. Comp. Stat. 505/1(c).

117. Defendants engage in "trade" or "commerce" in Illinois as defined by 815 Ill. Comp. Stat. 505/1(f).

118. The Products are "merchandise" as defined by 815 Ill. Comp. Stat. 505/1(b).

119. Plaintiff's purchase of the Products was a "sale" under 815 Ill. Comp. Stat. 505/1(d).

120. ICFA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false

pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact[.]" 815 Ill. Comp. Stat. 505/2.

121. Defendants' misrepresentations and other deceptive conduct, including the misrepresentations and other deceptive conduct described herein, constitute a violation of the ICFA.

122. Defendants engaged in deceptive acts or practices in violation of the ICFA by knowingly concealing, omitting, or failing to disclose the Products' sugar content, including through the misrepresentations and other deceptive conduct as described herein.

123. Defendants knew that the Products contained allulose, a sugar, despite presenting that they had "0g of Sugar" and "Zero Sugar."

124. Defendants intended that Plaintiff and the Illinois Subclass would rely on the overall impression of the packaging, along with the misrepresentations and other deceptive conduct described herein regarding the Products' sugar content, when deciding to purchase the Products, unaware that the Products contained allulose, a sugar.

125. Defendants' misrepresentations and other deceptive conduct, including the misrepresentations and other deceptive conduct described herein, occurred before Plaintiff and the Illinois Subclass decided to purchase the Products.

126. Plaintiff and the Illinois Subclass relied on, and were in fact deceived by, the overall impression of the packaging, along with the misrepresentations and other deceptive conduct, including the misrepresentations and other deceptive conduct described herein, with respect to the Products' sugar content.

127. The facts misrepresented, concealed, and/or not disclosed by Defendants were material facts in that Plaintiff, the Illinois Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Products.

128. For example, a reasonable consumer, such as Plaintiff, would want to know that food items, such as the Products, that were advertised as containing "0g of Sugar" and "Zero Sugar" included allulose, a sugar.

129. Had Plaintiff and the Illinois Subclass known the Products contained sugar, they would not have purchased the Products or paid the premium price.

130. A significant portion of the general consuming public or of Defendants' targeted consumers, acting reasonably in the circumstances, could be misled or deceived by Defendants' misrepresentations and other deceptive conduct as described herein.

131. Defendants' misrepresentations and other deceptive acts or practices caused Plaintiff and the Illinois Subclass to suffer injury in the form of actual damages when they purchased the Products that were worth less than the price they paid and that they would not have purchased had they known the Products contained allulose, a sugar.

132. As a direct and proximate result of Defendants' deceptive, misleading, unfair, and unconscionable practices as set forth above, Plaintiff and the Illinois Subclass are entitled to actual damages, compensatory damages, injunctive relief, attorneys' fees, and costs, as set forth in Section 10a of the ICFA.

133. Plaintiff is entitled to pursue a claim on behalf of the Illinois Subclass against Defendants for actual damages, punitive damages, injunctive relief, other equitable relief, and attorneys' fees and costs to remedy Defendants' violations of the ICFA pursuant to 815 Ill. Comp. Stat. 505/10a.

134. Plaintiff therefore seeks actual and punitive damages, declaratory and injunctive relief, and attorneys' fees and costs.

**COUNT V**
**Breach of Express Warranty**
**(On Behalf of Plaintiffs and the Nationwide Class)**

135. Plaintiffs hereby incorporate the foregoing paragraphs as if fully set forth herein.

136. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants under various state laws.[23]

137. Defendants' express warranties formed part of the basis of the bargain when Plaintiffs and members of the Nationwide Class purchased the Products.

138. The warranties include the promises and affirmations of fact Defendants made on the Products' and in its marketing that the Products contain "0g of Sugar" and "Zero Sugar."

139. This labeling and advertising constitute express warranties and became part of the basis of the bargain for Plaintiffs and members of the Nationwide Class when they purchased the Products.

140. As set forth above, Defendants purports through its labeling, marketing, and packaging to warrant that the Products contain "0g of Sugar" and "Zero Sugar." Defendants

[23] While discovery may alter the following, Plaintiffs assert that the states with similar express warranty laws under the facts of this case include, but are not limited to: Alaska Stat. § 45.02.313; A.R.S. § 47-2313; Ark. Code § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. § 42a-2-313; 6 Del. C. § 2-313; D.C. Code § 28:2-313; Ga. Code § 11-2-313; HRS § 490:2-313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. 5/2-313; Ind. Code § 26-1-2-313; K.S.A. § 84-2-313; KRS § 355.2-313; 11 M.R.S. § 2-313; Mass. Gen. Laws Ann. ch. 106 § 2-313; Minn. Stat. § 336.2-313; Miss. Code Ann. § 75-2-313; R.S. Mo. § 400.2-313; Mont. Code Ann. § 30-2-313; Neb. U.C.C. § 2-313; Nev. Rev. Stat. Ann. § 104.2313; RSA 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. § 25-2-313; N.D. Cent. Code § 41-02-30; ORC Ann. § 1302.26; 12A Okl. St. § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Codified Laws § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code § 2.313; Utah Code Ann. § 70A-2-313; 9A V.S.A. § 2-313; Va. Code § 8.2-313; Wash. Rev. Code Ann. § 62A.2-313; W. Va. Code § 46-2-313; and Wyo. Stat. Ann. § 34.1-2-313.

breached its express warranties by selling Products that each contain between 8 and 13 grams of allulose per labeled serving. The Products do not conform to Defendants' Zero Sugar Representations and warranties.

141. Plaintiffs and members of the Nationwide Class reasonably relied on the foregoing express warranties, believing that the Products in fact conformed to them.

142. Defendants had actual knowledge of the nonconformity at all relevant times because it formulated the Products with between 8 and 13 grams of allulose per labeled serving while labeling and advertising them as "0g of Sugar" and "Zero Sugar."

143. Plaintiffs and the members of the Nationwide Class would not have purchased the Products had they known the Products' true nature.

144. As a result, Defendanst breached the express warranties made to Plaintiffs and the Nationwide Class. Plaintiffs and all members of the Nationwide Class suffered financial injury and are entitled to relief allowed by law.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

145. Plaintiffs hereby incorporate the foregoing paragraphs as if fully set forth herein.

146. Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendants under Massachusetts law or, in the alternative, under the substantially similar laws of the states applicable to members of the Nationwide Class.

147. To the extent required, Plaintiffs assert this cause of action in the alternative to their legal claims, as permitted by Federal Rule of Civil Procedure 8.

148. Defendants' false and misleading Zero Sugar Representations caused Plaintiffs and Class Members to pay a price premium for the Products.

149. Defendants thereby received a direct and unjust benefit at the expense of Plaintiffs and Class Members.

150. Plaintiffs and Class Members seek the return of that unjust benefit.

**COUNT VII**
**Common Law Fraud**
**(On Behalf of Plaintiffs and the Nationwide Class)**

151. Plaintiffs hereby incorporate the foregoing paragraphs as if fully set forth herein.

152. Plaintiffs bring this claim on behalf of themselves and members of the Nationwide Class against Defendants for common law fraud.

153. Plaintiffs bring this claim under the laws of the Commonwealth of Massachusetts.

154. Defendants have willfully, falsely, and knowingly misrepresented the Products through the Products' Zero Sugar Representations, as it knew that the Products were not free of sugar.

155. Defendants have therefore made knowing, fraudulent misrepresentations as to the Products.

156. Defendants' misrepresentations were material (i.e., they affected Plaintiffs' and Class Members' purchasing decisions given their importance), and were central to the Products' functionality because the Products are advertised as free of sugar, but in fact contain sugar in the form of allulose.

157. Defendants knew or recklessly disregarded the fact that the Products' Zero Sugar Representations were false and deceptive.

158. Defendants intended that Plaintiffs and members of the Classes rely on the Products' advertising, because, if they had known the truth that the Products' Zero Sugar Representations were false and misleading, they would have paid less for the Products or would not have purchased them at all.

159. Plaintiffs and members of the Classes have reasonably and justifiably relied on Defendants' misrepresentations when purchasing the Products, and if Plaintiffs and members of the Classes had known the truth about the Products, they would not have paid monies for the Products or would have paid less monies for the Products.

160. For these reasons, Plaintiffs and members of the Classes have suffered monetary losses, including interest they would have accrued on these monies, as a direct and proximate result of Defendants' fraudulent conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants as follows:

a) For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Classes, and Plaintiffs' Counsel as Class Counsel;

b) For an order declaring that Defendants' conduct violates each of the statutes referenced herein;

c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d) For an award of actual, compensatory, statutory, treble, and punitive damages to the extent permitted by applicable law;

e) For prejudgment interest on all amounts awarded;

f) For restitution to the extent permitted by applicable law;

g) For injunctive relief as pleaded or as the Court may deem proper, including an order requiring Defendants to cease labeling, marketing, and selling the

Products with the Zero Sugar Representations and to make affirmative disclosures sufficient to dispel the public misperception created by Defendants' conduct;

h) For an order awarding Plaintiffs' and the Classes' reasonable attorneys' fees, expenses, and costs of suit; and

i) For such other and further relief as the Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: October 30, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

*/s/ Max S. Roberts*

Max S. Roberts (BBO #718031)
L. Timothy Fisher*
Joshua B. Glatt*
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: mroberts@bursor.com
ltfisher@bursor.com
jglatt@bursor.com

**BURSOR & FISHER, P.A.**
Caroline Cella Donovan*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: cdonovan@bursor.com

**GUCOVSCHI LAW FIRM, PLLC**
Adrian Gucovschi, Esq.*
165 Broadway, Fl. 23
New York, NY 10006
Telephone: (212) 884-4230
Email: adrian@gucovschilaw.com

*Counsel for Plaintiffs and the Classes*

*** pro hac vice application forthcoming*